

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-15-607

| | |
|---|---|
| AUTUMN VOGEL<br><br>APPELLANT<br><br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br>APPELLEES | **Opinion Delivered** November 18, 2015<br><br>APPEAL FROM THE SALINE COUNTY CIRCUIT COURT<br>[No. 63JV-13-392]<br><br>HONORABLE GARY ARNOLD, JUDGE<br><br>AFFIRMED |

## LARRY D. VAUGHT, Judge

Appellant Autumn Vogel appeals the termination of her parental rights to her son B.H. (born December 9, 2013). On appeal, Autumn argues that (1) her due-process rights were violated when the circuit court held the termination hearing in her absence and without her participation by phone or other remote means, (2) her appointed attorney's failure to insist on her presence at the hearing or require proof of personal service upon Autumn amounted to ineffective assistance of counsel, and (3) the termination decision was clearly erroneous. We affirm.

Autumn was incarcerated when she gave birth to B.H. in December 2013. There was no suitable legal caregiver available for B.H., so the Department of Human Services ("DHS") petitioned for and obtained emergency custody of him. In the ex parte prder for emergency custody, filed December 13, 2013, Autumn was appointed an attorney. On January 6, 2014, a probable-cause hearing was held. The probable-cause order stated that

Autumn had been served "by substituted service upon the Warden at Wrightsville Women's Unit, on December 17th, 2013." Autumn and her attorney were present at the hearing. The court found probable cause for the removal of B.H. and his continued care by DHS.

Autumn was still incarcerated at the time of the March 5, 2014 adjudication hearing but attended the hearing with her attorney. B.H. was adjudicated dependent-neglected, and the order stated that Autumn had been personally served on February 10, 2014. The order stated that Autumn was ordered to follow the case plan, cooperate with DHS, remain in regular contact with DHS, submit to a drug-and-alcohol assessment, submit to random drug screens and test clean on all screens, attend individual counseling, complete a psychological evaluation, complete parenting classes, obtain and maintain a safe and clean home, obtain and maintain stable employment, and follow all recommendations that result from DHS services.

On July 7, 2014, Autumn attended a review hearing with her attorney. In its review order, the court found that DHS was making reasonable efforts to provide family services to achieve the goal of reunification. The court also provided a concurrent case goal of adoption.

Autumn was released from prison on parole in August 2014. She initially resided at Recovery Centers of Arkansas. On or around October 31, 2014, she began renting a home on Sardis Road in Mabelvale, Arkansas. The home belonged to an acquaintance who had recently been incarcerated on drug charges. The home is listed on the National Clandestine Laboratory Register for Arkansas on the Drug Enforcement Agency's website as having been the site of a methamphetamine lab. When DHS discovered the home's history as a

meth lab and determined that it was contaminated with meth, a caseworker informed Autumn that the home was not safe and appropriate for a child. Autumn was told that she would have to find another, more suitable, home before being allowed to care for B.H.

Autumn attended the permanency-planning hearing on November 17, 2014, with her attorney. At the hearing, Autumn was again ordered to comply with the case plan, including an order to obtain safe and appropriate housing and test clean on random drug screens. The next hearing, a fifteen-month review hearing, was set for February 2, 2015. In the permanency-planning order, the court found that the case was not moving toward an appropriate permanency plan for the child and authorized DHS to file a petition for the termination of Autumn's parental rights.

Between the hearing on November 17, 2014, and the hearing on February 2, 2015, Autumn refused to move out of the methamphetamine-contaminated home until, approximately a week before the February hearing, her parole officer ordered her to find alternative housing or risk parole revocation. Between the two hearings, Autumn tested positive for methamphetamine once and alcohol twice. By this point, Autumn had also missed numerous visitations with her child. The day before the February 2 hearing, Autumn was arrested in Rockwall, Texas, on charges of identity theft, possession of a controlled substance, and possession of drug paraphernalia.

On February 2, 2015, the court held the fifteen-month review hearing. Autumn's attorney attended, but Autumn did not attend due to her incarceration in Texas. The court found that returning B.H. to Autumn's custody was contrary to his best interest and set adoption as the case goal. On the day of the review hearing, DHS filed a petition for

3

termination. In the review order, the court stated that a hearing on the petition to terminate Autumn's parental rights was scheduled for April 20, 2015, at 9:00 a.m.

The termination hearing was held on April 20, 2015. Autumn was not present because she was still incarcerated in Texas. Autumn's attorney attended the hearing. At the outset of the hearing, B.H.'s father's appointed attorney moved for a continuance, stating that he had not been able to locate his client and did not know if his client had been served with the petition or notice of the hearing. The court denied the continuance, stating that the father was aware of the case and of the appointment of counsel and that it was the father's responsibility to contact the attorney.

The court then asked if Autumn was present. Her attorney responded,

No, Your Honor. My client is still incarcerated in Rockwall, Texas. I do not know whether or not she's been served. I know that I received a copy of the [termination of parental rights] petition, but I don't know if she's been served.

The attorney for DHS stated that Autumn had been served in Texas on February 6, 2015, but no evidence of service was introduced. The court then proceeded with the termination hearing.

At the hearing, DHS caseworker Erin Descoteaux testified that Autumn had completed some requirements of the case plan, such as parenting courses, but that she had not completed other requirements, such as obtaining stable housing, remaining drug free, and completing counseling. The caseworker testified that Autumn had previously had her parental rights terminated as to three of B.H.'s siblings. The caseworker also stated that Autumn missed several visitations with B.H.

4

Although Autumn was not present, her attorney made numerous evidentiary objections and cross-examined the caseworker to reveal that (1) Autumn had complied with numerous case requirements while in prison and while on parole; (2) Autumn was on a limited budget, making it difficult for her to find alternative housing; (3) Autumn submitted a letter to DHS from an unspecified government agency stating that the house was not on the DEA's clandestine-labs register; (4) Autumn had attempted to clean the house herself to make it suitable; (5) Autumn had said she was sick when she missed visitations and that the meth residue from the house could have made her sick; (6) the meth residue in the house could have possibly caused Autumn's positive drug screen; and (7) Autumn had submitted information to DHS about a prescription medication she was taking that could have caused the positive drug screen. Autumn's attorney also helped clarify that Autumn was not associated with the home's owner, who had gone to prison on drug charges. Autumn's attorney argued that, at the last hearing, the court had ordered DHS to progress toward unsupervised visitation, which it had not done. The caseworker stated that the unsuitable home and the positive drug screen prevented DHS from moving toward unsupervised visitation.

Rebecca Kincannon, a DHS adoption specialist, testified that B.H. was adoptable and that there was an appropriate foster family interested in adopting him. Autumn's attorney cross-examined Kincannon to question her statement that she "knew the family," revealing that she actually had very little knowledge of the family, having only interacted with them for the past year at a few foster-parent meetings.

Autumn's attorney did not call any witnesses or introduce exhibits on Autumn's behalf. However, she made a closing argument, stating that Autumn had complied with all DHS requirements prior to being arrested in Texas and arguing that DHS had failed to adequately prove that Autumn's rights had previously been terminated as to B.H.'s siblings.

The court granted the petition to terminate parental rights as to both parents. The court's termination order, entered on April 27, 2015, found that Autumn had manifested the incapacity or indifference to remedy factors or issues that had arisen subsequent to the filing of the original petition for dependency-neglect, demonstrating that placement of the child with Autumn would be contrary to his health and safety. Specifically, the court found that the child was removed from Autumn's custody at birth because she was incarcerated and could not care for him; Autumn was properly served at the outset of the case; Autumn had been ordered to obtain and maintain stable housing and employment and to comply with the case plan; she paroled out of prison on August 14, 2014, and moved into a home that had previously been operated as a meth lab and was owned by a man recently incarcerated on drug charges; DHS had advised her that the home was inappropriate and that she would need to relocate; on February 1, 2015, Autumn was arrested in Rockwall, Texas, and was currently incarcerated there; she had tested positive for meth and alcohol; she had missed several visitations with B.H.; she was likely to be incarcerated for a significant period of time; she had failed to comply with the case plan; she had previously had her parental rights terminated as to three of B.H.'s siblings; there was little likelihood that additional services would result in reunification;  B.H. had remained out of Autumn's custody for over a year; reunification could not be achieved within a time frame consistent with B.H.'s needs; and

the DHS caseworker's testimony was credible. The court also found that termination was in B.H.'s best interest given the likelihood that he would be adopted and the potential harm to his health and safety should he be returned to Autumn's custody. Autumn filed a timely appeal.

Autumn argues that her constitutional right to due process was violated because she was not provided adequate notice of the termination hearing and an opportunity to participate in the hearing. She admits that these arguments were never raised below. She argues that, despite her admitted failure to preserve her due-process arguments, we should allow her to present them for the first time on appeal because her attorney's failure to raise these issues to the trial court was ineffective assistance of counsel so flagrant and egregious that it falls within the third exception to the preservation rule outlined in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). We disagree.

In *Wicks*, the Arkansas Supreme Court reaffirmed the importance of the contemporaneous-objection rule while outlining a few finite exceptions to the rule. The third exception "relates to the trial court's duty to intervene, without an objection, and correct a serious error either by an admonition to the jury or by ordering a mistrial." *Wicks*, 270 Ark. at 786, 606 S.W.2d at 369. In *Wicks*, the court stated that a reversal on such grounds would be "an extremely rare exception" to the rule. *Id.*, 606 S.W.2d at 369. We have interpreted the third *Wicks* exception to mean that "no objection is required to preserve an issue for appeal where the error is so flagrant and egregious that the trial court should, on its own motion, have taken steps to remedy it." *Baker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 400, at 3. Therefore, in this case, we must determine whether Autumn's attorney's failure to require

proof of personal service on Autumn and failure to insist upon Autumn's presence or participation at the hearing were flagrant and egregious errors requiring the trial court to intervene.

Autumn argues that she was not properly served with the termination petition.[1] Arkansas Code Annotated section 9-27-341(b)(2)(A) states that service of a termination petition will be upon the parent's attorney pursuant to Rule 5, unless (among other things) the parent was not served under Rule 4 "at the initiation of the proceedings." Here, the court found, and Autumn has not disputed, that her attorney was served with the termination petition under Rule 5. Autumn argues for the first time on appeal that she did not receive proper Rule 4 service at the outset of the case, thereby necessitating Rule 4 service of the termination petition. She claims that, because the probable-cause order only states that she was served with notice of the probable-cause hearing by substitute service at the Wrightsville Unit and does not specify that a copy of the notice was also mailed to her first class, marked "legal mail," her initial service under Rule 4 was defective. She acknowledges that she participated in the case after the allegedly defective service, thereby waiving any objection she may have had as to the adequacy of her original service at the outset of the case. However, she now argues that, regardless of her waiver, improper Rule 4 service at the outset of the case meant that DHS had to serve the termination petition on her personally under Rule 4 rather than upon her attorney under Rule 5.

---

[1] Autumn's brief specifically challenges service of the petition, not notice of the hearing. However, we note that the petition contained notice as to the date, time, and location of the termination hearing; therefore, the issues are one and the same.

At the termination hearing, everyone involved in the case was operating under the understanding that Autumn was initially served under Rule 4, allowing subsequent service under Rule 5. The court had previously found that Autumn had been properly served at the outset of the case and again made such a finding in the termination order, and Autumn never challenged either finding until this appeal. At the termination hearing, her attorney stated that she (the attorney) had been served, as is allowed under Rule 5. Under those circumstances, we cannot say that Autumn's attorney's lack of knowledge about whether Autumn had also been personally served with the termination petition and notice of the termination hearing and counsel's failure to require proof of Rule 4 service of same were flagrant and egregious errors that required the court to step in on its own.[2] Prior to appeal, there was never any claim that the initial Rule 4 service was improper, so there was no basis for requiring anything more than Rule 5 service of the termination petition on Autumn's attorney. We therefore disagree that Autumn's attorney's failure to require proof that the termination petition was personally served on Autumn in prison presented the type of flagrant and egregious error sufficient to invoke the third *Wicks* exception.

Next, Autumn argues that her absence from the hearing violated her due-process rights, and her attorney's failure to take any steps seeking her presence or participation at the hearing was an error flagrant and egregious enough to fall within the third *Wicks* exception. Again, we disagree. Federal courts have found that prison inmates do not have a due-process

---

[2] As has been discussed, Rule 4 service of the termination petition on Autumn was not required under the statute where the court had previously found that Autumn had been properly served under Rule 4 at the outset of the case. However, although it was not required, the DHS attorney indicated that Autumn had been served in Rockwall, Texas, with the termination petition on February 6, 2015, in addition to Rule 5 service upon her attorney. The court's docket also reflects service on Autumn on February 6, 2015.

right to be present at civil hearings. *See Fruit v. Norris*, 905 F.2d 1147, 1150 n.6 (8th Cir. 1990). This includes termination proceedings, as long as the inmate-parent is represented by counsel at the hearing, the counsel participates by making evidentiary objections and cross-examining witnesses, and the inmate has the opportunity to present testimony by deposition or other recorded format if that testimony could influence the outcome of the proceedings. *See Cook v. Boyd*, 881 F. Supp. 171, 175 (E.D. Pa. 1995); *In re Interest of J.S.*, 470 N.W.2d 48, 52 (Iowa Ct. App. 1991).

In this case, Autumn was represented by counsel who participated at the hearing by making evidentiary objections, cross-examining witnesses, and making a closing argument on her behalf. Because Autumn failed to raise her due-process argument below, there has been no development of the relevant facts, and we do not know whether she had an opportunity to present testimony by deposition or other recorded means or if such testimony would have influenced the outcome of the case. As a result, the only way we can address Autumn's underlying due-process argument is if we find that her attorney's failure to insist upon her presence at, or remote participation in, the termination hearing amounted to flagrant and egregious error requiring the court to step in on its own accord. We cannot say that there was any error that rose to that level. The trial court was presented with a situation that appeared to comport with the well-established due-process requirements for conducting a termination hearing in the parent's absence. In this case, Autumn's attorney presented her case effectively, and it is very likely that Autumn's deposition or recorded testimony would not have influenced the outcome, given that it was undisputed that she had previously had her parental rights terminated as to three of B.H.'s siblings, had ongoing drug problems, and

was currently incarcerated and unable to care for the child. Under these circumstances, the trial court could have reasonably assumed that all due-process safeguards had been met to allow the termination hearing to proceed without Autumn. We cannot say that, given the facts before it, the trial court should have stepped in and raised Autumn's due-process argument on its own.[3] Therefore, we hold that this issue does not fall within the third *Wicks* exception, and we cannot address it due to lack of preservation.

Moreover, we note that Autumn's ineffective-assistance-of-counsel arguments fail for another reason: she has not demonstrated a reasonable probability that the court's decision to terminate her parental rights would have been different absent her attorney's alleged errors. *See Abernathy v. State*, 2012 Ark. 59, at 4, 386 S.W.3d 477, 481. Despite Autumn's allegations related to notice of the hearing and opportunity to participate, it is apparent that her counsel presented Autumn's case as well as possible, given the facts. Autumn and her attorney had worked together on the case for several months, and her attorney demonstrated a fairly thorough understanding of the case. We therefore disagree with Autumn's statement on appeal that "it appears that Autumn's lawyer never spoke with Autumn about the petition." We cannot make such an inference based on the record before us. Her attorney cross-examined each witness effectively, demonstrated that Autumn had met most of the case-plan requirements, and provided alternative explanations for negative testimony.[4] Also,

---

[3] This is not to say that we are not troubled by the possibility that Autumn may not have been given a full opportunity to participate in the termination hearing, only that we cannot reach this issue due to her failure to raise it below.

[4] For example, she elicited testimony that the residue from the meth house could have caused Autumn's positive drug screen and that the house could have made Autumn sick, which could have explained her missed visitations.

SLIP OPINION

Autumn had previously had her parental rights terminated as to several other children, she was incarcerated at the outset of this case and then again on new charges by the time the court heard the termination hearing, she had no way to currently care for B.H. or do so in the near future, she had tested positive for meth and alcohol, she had failed to obtain a safe and appropriate home, she had missed numerous visitation opportunities with B.H., and she provided no support for the child while he was in DHS care. Simply put, the facts overwhelmingly favored termination of Autumn's parental rights, and Autumn has not demonstrated that her attorney's alleged errors would have affected that outcome.

Finally, for the reasons just stated, we disagree with Autumn's argument that the trial court's findings as to statutory grounds and best interest were clearly erroneous. The record and the testimony provided ample support for the trial court's findings, and we affirm.

Affirmed.

KINARD and GRUBER, JJ., agree.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Mischa K. Martin*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.