Cite as 2022 Ark. App. 438

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-22-129

| | |
|---|---|
| ANITA FARFAN | Opinion Delivered NOVEMBER 2, 2022 |
| APPELLANT | |
| | APPEAL FROM THE VAN BUREN |
| V. | COUNTY CIRCUIT COURT |
| | [NO. 71JV-20-19] |
| ARKANSAS DEPARTMENT OF | HONORABLE SUSAN WEAVER, |
| HUMAN SERVICES AND MINOR | JUDGE |
| CHILD | |
| APPELLEES | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Anita Farfan appeals the Van Buren County Circuit Court's permanency-planning

and termination-of-parental-rights (TPR) orders, arguing four points on appeal: (1) the trial

court did not have subject-matter jurisdiction; (2) she was denied due process; (3) sufficient

proof did not support the statutory grounds for TPR; and (4) TPR was not in the child's best

interest. We affirm.

I. *Facts and Procedural History*

On September 1, 2020, appellee Arkansas Department of Human Services (DHS)

filed a petition for emergency custody and dependency-neglect claiming that Anita's minor

child, born August 16, 2019, was at serious risk of harm due to neglect. The attached affidavit

alleged that Anita and the child's putative father, Robert Spackeen, live in Albuquerque,

New Mexico.[1]  On August 30, the child was in the car when Robert was pulled over by police in Searcy County, Arkansas, and an officer discovered marijuana on the front seat and what appeared to be crystal methamphetamine packets on the car's floor.  Robert did not have a driver's license, and he told the officer that he had a marijuana card but did not produce it.  When the officer opened the driver's car door, Robert "took off and spun the car in the parking lot and took off down Highway 65."  Later, DHS was notified that Robert and the child were being taken by ambulance to Ozark Health Hospital.  They had been found in Van Buren County after Robert had turned down a dirt road, left his car, and taken the child into the woods.  Robert was arrested, and the child was placed in foster care.

The affidavit reflects that DHS contacted Anita, who was described as hesitant about providing information without first speaking to an attorney.  Anita refused to provide her husband's name but stated that he was on his way to Illinois with their son for a painting job and that family planned to care for the child while Robert was working.  Anita said that she works, goes to school, and does not have child care.  When Anita called DHS back, she was upset and said that she was coming to Arkansas to get her baby and that DHS had no right to have him in its custody.  She became irate and said that she had been married to Robert for a month, that they were having problems in their relationship, and that Robert does not take drugs.  When interviewed, Robert claimed that the child is his biological son and that they were on their way to Illinois to pick up his nieces and take them back to New

---

[1]The minor child has five siblings, the oldest of which was born in 2006 and the youngest in 2016.

Mexico. He said that they planned to stay in Illinois for a week, that he was driving through Arkansas for a change of scenery, that he had been married to Anita for a little over a year, and that he takes opiates and sometimes amphetamines. He said that Anita was not aware of his drug use and that she does not take drugs. Robert tested positive for amphetamines, methamphetamine, opioids, and THC.

On September 3, an ex parte order placed the minor child in DHS custody until further order. An attorney was appointed for Anita, and an attorney ad litem (AAL) was appointed for the child.

On September 8, a probable-cause hearing was held, and Anita and her attorney were present.[2] The trial court held that emergency conditions continued and that it was in the child's best interest to remain in DHS custody. The order states, "Anita Farfan testified, and the court did not find her testimony regarding the plan for the juvenile to be believed." DHS was authorized to arrange visitation with law enforcement present.

On September 23, the AAL filed a motion alleging that at the Zoom hearing on DHS's petition, Anita represented that she is the minor child's mother, that she is a resident of New Mexico, and that she intended to travel to Arkansas to see the child. She said that she had the child's birth certificate and would provide a copy to DHS, but she failed to provide the birth certificate when she arrived on September 9. The AAL argued that visitation should be halted until Anita provided a certified copy of the birth certificate.

---

[2]The probable-cause order was filed October 26, 2020, and it does not reflect that the hearing was held via videoconference.

3

Further, Anita should submit to a DNA test within seven days or visitation should be halted again.

On November 3, DHS amended its emergency petition and attached affidavit to include that the minor child tested positive for methamphetamine, amphetamine, morphine, codeine, heroin, and THC. Also on November 3, a hearing was held on the AAL's motion, and Anita was ordered to submit to a maternity test within seven days.

On November 30, an adjudication hearing was held, and Anita did not attend, but her attorney appeared.[3] The adjudication order states,

a. [Robert] testified that he and [Anita] are residents of New Mexico. [Robert and Anita] were not married at the time of the birth of [the minor child].

b. Officer Bassinger testified that [Robert] was traveling through Arkansas and fled from a traffic stop. He abandoned the car, and 40 g of marijuana, scales, shackles, handcuffs, and a loaded gun w[ere] found in the car. In the chase, law enforcement had to draw his gun and [Robert] placed the child in front of him. Once he was apprehended, law enforcement found 80 g of methamphetamine on his person.

c. The mother did not attend the hearing stating that her daughter had an all day autism assessment that had been scheduled for two years though she did not provide proof.

d. The court noted that the mother's prior testimony that she allowed the child to travel with [Robert] who had a suspended driver's license and prior felony criminal record and seemed uncertain about when the child left, where the child was going, who the child was traveling with and when the child would return. The mother's statements in the probable cause hearing regarding not knowing that [Robert] had a drug history do not seem credible or she is not able to protect the child as she is

---

[3]A continuance order signed November 4, 2020, but which was not filed until February 22, 2021, states that the adjudication hearing would be continued to November 30, 2020, because Anita was having technical issues with her phone and was unable to attend the hearing via Zoom. Anita was ordered to submit to DNA testing.

4

unaware of issues he has openly admitted in this case. The mother has failed to comply with the Court Order to obtain a DNA test.

The court found the child dependent-neglected, and the goal of the case was reunification with a concurrent plan of adoption.

On December 3, a disposition hearing was held via Zoom, and the court found that the child needed services and that returning custody to Anita would be contrary to the child's welfare. The court held,

> Specifically, the court notes that the putative father is currently incarcerated and the child cannot be safely placed with him due both his incarceration and due to [his] substance abuse issues. With regard to [Anita], the court finds that [the minor child] cannot be safely returned to her at this time. The court finds that [Anita] lacks credibility and has not been truthful with the court. The court finds that [Anita] allowed her child to leave with [Robert] and that she did not know where the two were going or for how long. [She] denied any knowledge of drug use by [Robert] although the two were married and living together. [She] testified that she was "gone all the time" so she did not know [Robert] was using drugs.

> The court finds that since the removal, [Anita] has come to one in-person visit during which she initially refused a drug screen and then four hours later, she came back to DHS to provide a sample, but she did not want Ms. Hutto to listen while she provided a sample, and the sample showed that it was adulterated in that the specific gravity was off. Although [Anita] traveled all the way from New Mexico for the visit, she only stayed for 90 minutes of the 4 ½ [hour] visit, stating that she had to attend online classes. She testified that her classes took priority over seeing her child because she was attending school to better herself for her kids. She has since dropped out of school.

> [Anita] failed to submit to maternity testing within seven (7) days as previously ordered, and the court has serious concerns about whether she is even the biological mother of [the minor child]. [Anita] failed to appear at the adjudication hearing and she failed to appear at her staffing scheduled on this date. She testified that she slept through the staffing today and that she failed to attend adjudication because her other child had autism testing, although she has not provided proof of the appointment. [Anita] has failed to demonstrate that her child is a priority or that she is capable of adequately supervising him and ensuring that his needs are met. She has failed to

demonstrate that [the minor child] will have a sober caregiver if he is returned to her custody.

The court ordered Anita to comply with the case plan; refrain from alcohol or drug use; submit to random drug screens, a drug-and-alcohol assessment, and a psychological evaluation; obtain and maintain safe, stable, and appropriate housing and employment; complete parenting classes; attend all visitation and individual counseling; resolve any outstanding legal issues; cooperate with efforts to resolve the issue of paternity; submit to maternity DNA testing within seven days; provide proof that she was at a doctor's appointment for autism testing on the date of the adjudication hearing; and submit to hair-follicle testing within forty-eight hours.

A status hearing was held on December 15, and Anita appeared with her attorney. The court found that Anita had not completed genetic testing as ordered, and the case was continued until February 3, 2021.

On February 1, the AAL moved to stop reunification services, alleging that at the December 3 disposition hearing, "The court did not find [Anita's] testimony credible and ordered her to submit to the DNA test as well as the hair-follicle [test] or face contempt charges, which may result in jail time."  The AAL claimed that DHS had contacted New Mexico DHS, which initially reported that Anita's children were not in school and that the home had environmental issues.  New Mexico DHS attempted to reach Anita again to determine the condition of the home, but Anita did not return the calls; therefore, New Mexico's case was closed.  DHS had also contacted New Mexico DHS for information

regarding placement with Anita's sister. The sister completed the papers but then moved and did not keep in contact with New Mexico DHS; therefore, the file was closed. The AAL alleged that Anita visited for one and a half hours on September 9, 2020, that she visited one hour on September 24 because she forgot about her visit and had a conflict, and that she did not answer calls for her visits on November 10 and December 23; otherwise, Anita attended thirteen video visits. Further, Anita had placed money in Robert's commissary account but had said that she was not sure how the rent would be paid. The AAL alleged,

> [Anita] even indicates that she was shooting up in her neck, she is unable to hold a conversation if she is sober, needs the drugs to address her anxiety, and she needed to go to rehab. [Anita] indicated that she was passed out in a coma the day of the adjudication hearing missing it and the evaluation for her child. Someone named Essai texted [Robert] that he was texting on behalf of [Anita] because he had found [her] passed out in the car and took her into the house.
>
> . . . .
>
> [Anita] indicates that she went to take the DNA test but had no idea that she needed an identification card to take the test. She states that hers was lost in the move. New Mexico records indicate that her license was revoked for failure to appear. Even at that, she would still have the license for identification though she could not drive with it. She drove after the license was revoked and admitted the same in court.

The AAL argued that there was little likelihood services would result in successful reunification and asked that visitation cease. The AAL claimed that Anita was in contempt for failing to take the DNA and hair-follicle tests, that she was warned that possible jail time could be the consequence, and that because she lives in New Mexico, the consequence was unlikely. The AAL requested that DHS no longer be required to provide additional reunification services to Anita.

On February 3, a review hearing was held via videoconference, and Anita appeared with her attorney. The court noted that Anita's testimony was not credible and held that the minor child needed services and should remain in DHS custody. The court found that Anita was less than noncompliant with the case plan, that she had failed to complete a court-ordered DNA test, and that she had not maintained contact with DHS, and Anita was ordered to take a hair-follicle test. The goal of the case continued to be reunification.

The order states,

> Anita Farfan testified that she did not have a driver's license so she could not complete the hair-follicle DNA testing. She has moved so the distance and gas money issue mentioned at prior hearing has resolved itself. She has visited sporadically and due to missing visits, is required to confirm visits 48 hours in advance. She admitted to missing a visit due to drinking bleach and having to go to the emergency room. She was unwilling to respond to the Court's question as to whether her other children were present when she drank bleach. She does not have permanent housing and currently resides in hotel while she is waiting on her housing voucher. She was very recently employed as an assistant at a construction company but she has not been there long so she is not sure of the complete name of the company. She states that she did everything she was supposed to do for New Mexico so she does not know why they closed her case. She obtained her counseling intake appointment last night and is setting up services. She found a picture of her driver's license on her phone so she has that for identification. She has worked towards resolving her legal issues in New Mexico and after the last case is set, she should be able to have her driver's license reinstated. She is currently using methadone through a clinic she met with last week to assist her in not relapsing due to the stress. The Court notes the testimony of Anita Farfan and finds that said was not credible.

The court found that it was unclear whether Anita is the child's biological mother and that she had no significant contacts with the child. The court also noted the DHS caseworker's testimony that Anita had tried to obtain services in New Mexico, but New Mexico had closed its case because Anita was nonresponsive.

On February 3, the court ruled on the AAL's contempt and no-reunification-services motions.[4] Anita appeared via Zoom, and she was ordered to produce copies of any recordings she had made of the juvenile proceedings and not to record any future hearings.[5] The court found that Anita had failed to submit to a DNA or hair-follicle test and that she had not submitted to any services in New Mexico, and the case there was closed. The court ordered that DHS is no longer to provide reunification services, including visitation, until Anita completed the DNA and hair-follicle tests.

On March 18, DHS and the AAL filed a joint motion to halt visits and relieve DHS of providing services to Robert because he had refused paternity testing. Robert testified at a hearing that he is not the minor child's father, and he was dismissed as a party. DHS was relieved from providing further reunification services to him.

On August 12, a permanency-planning hearing was held via videoconference, and Anita and her attorney were present. The court admitted DHS's court report and the ICPC home study for Rebecca Farfan, Anita's sister. The court noted testimony from DHS caseworker Lorie Hutto and Rebecca. The order states:

> 7. . . .[Anita] did the DNA test after four months but still has not completed the hair follicle. . . . The Court relieved [DHS] of providing any reunification services due to the mother's lack of participation. [DHS] did submit an ICPC to New Mexico for the grandmother and for the sister. The sister was moving so initially it was denied and then reviewed. New Mexico approved the sister for placement. Ms. Hutto has concerns because the references were not interviewed, the bedroom space does not meet Arkansas standards, the budget does not add up and shows to be in the red by

[4]The order is filed-marked April 22, 2021.

[5]This ruling addressed the AAL's contempt motion filed on February 4, 2021.

9

$450 each month, the sister said that there are no other children in the home but has previously stated that Anita Farfan's children stay with her regularly. Also, the brother has a drug criminal history, and the sister helps him out from time to time.

8. Rebekah [sic] Farfan testified that her middle name is Mia. . . . She and Lamberto, her fiancé[], provided the caseworker with the names and numbers for references. None of the references received an email from the caseworker so she provided Ms. Sena with their phone numbers. The references are willing to write letters. The home she is currently residing contains three bedrooms and three bathrooms. . . . They are looking for a four-bedroom trailer. Her brother has had a drug abuse problem and has been homeless. She has provided him shoes and names of homeless shelters. He would not live with her. Lamberto is a civilian working at Sandia National Labs under a government contract. His income is closer to $45,000. She does not work but receives a $500 social security check for her son with autism. . . . They have completed their RAFT training through DHS. They want to raise him as their own child and even willing to relocate to Arkansas. She is willing to follow the court guidelines even if it means that Anita Farfan could not see him which would cause hostility. She and Anita Farfan are very close and co-parent.

The court authorized a plan for adoption and authorized DHS to file a TPR petition. The court ordered that Anita would not be permitted to attend the TPR hearing by video.

In an amended permanency-planning order, the court added that it denied Rebecca's motion for placement pursuant to the ICPC, stating,

[T]he court has concerns in that Rebekah [sic] Farfan states that she co-parents with [Anita] and speaks with her constantly and yet she does not know [Robert], [Anita's] husband. Rebekah did not seem to know about the mortgage or situation with the home she is residing in though she did seem to say the home was in probate and was being sold.

On September 17, DHS filed a petition for termination of Anita's parental rights on the statutory grounds of failure to remedy, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2021); failure to support, section 9-27-341(b)(3)(B)(ii)*(a)*; abandonment, section 9-27-341(b)(3)(B)(iv); subsequent factors, section 9-27-

341(b)(3)(B)(vii)*(a)*; and aggravated circumstances, section 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*. DHS alleged that TPR was in the minor child's best interest, that he is adoptable, and that he would be subjected to potential harm if returned to Anita.

On October 11, Anita filed a motion for cash assistance or, in the alternative, permission to attend the TPR hearing via Zoom. She asked for $1,859 to pay for car rental, hotels, and meals for her and her five children. Alternatively, she asked that she be able to attend the hearing via Zoom. The court granted her request for cash assistance.

On October 13, DHS filed a consolidated motion to vacate or set aside the order granting cash assistance. It argued that under Arkansas Code Annotated section 9-27-303(10)(a) (Repl. 2020), cash assistance is defined as short-term financial assistance, which was not designed to prevent or alleviate the need for removal and is not required for the court to proceed with a termination hearing. Anita responded, asking that the court leave the order in place. On October 25, the court set aside its order as follows:

1) On April 22, 2021, this court found that the Plaintiff attempted to assist Defendant to obtain services, but she had not submitted to any services. Additionally, this court ordered Plaintiff to no longer provide reunification services.

2) After consideration of the above finding, as well as Plaintiff's Motion and Defendant's response, the Court finds the Order shall be set aside.

Anita did not appear at the TPR hearing, and her counsel argued that because she was indigent and not allowed to appear via Zoom, her opportunity to participate in the hearing was canceled. The court asked counsel if she was prepared to proceed without Anita, and she responded, "Yes, Your Honor, as prepared as you can be without a client." After a

11

short break, Anita's counsel asked the court to reconsider its decision to proceed without Anita because her absence impeded counsel's ability to defend the case. Counsel said, "I'm asking that the court reconsider some way for her to effectively participate. I don't care what that is, but I would need to be able to communicate with my client and her to be able to hear testimony and assist me in her defense." The circuit court denied the motion.

Lorie Hutto, the DHS caseworker, testified that she had been on this case since the beginning and that DNA testing had confirmed that Anita is the child's mother. She said that Anita had refused to take the hair-follicle test but that she had submitted to a DNA test. Hutto had concerns about Anita's suspected drug use due to her history and her behavior during Zoom visits and court hearings. She testified that Anita had stated she had a previous drug problem and that the minor child was born with drugs in his system. Hutto said that Anita had unstable housing and was unemployed during most of the case. Anita quit attending the visits with her child, and she failed to cooperate with the authorities in New Mexico and Arkansas. Hutto said that Anita talks a good game but that she has not done anything that DHS or the court had asked her to do. Hutto said that the child has not bonded with Anita and that there is nothing else that DHS can do to reunify the child with Anita. She said that the child is healthy, that he is receiving therapies and things that he needs, that he is adoptable, that his current placement had expressed an interest in adopting him, and that it is in his best interest that parental rights be terminated.

The circuit court granted the TPR petition on the grounds alleged in the petition and found that it was in the child's best interest to terminate Anita's parental rights. The TPR order was filed on December 8, 2021, and Anita filed a notice of appeal on December 20.[6]

## II. *Applicable Law and Standard of Review*

In applying the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), we stated,

> The UCCJEA provides the exclusive method for determining the proper forum in child-custody proceedings involving other jurisdictions. *Ark. Dep't of Hum. Servs. v. Waugh*, 2015 Ark. App. 155, 457 S.W.3d 286. A child-custody proceeding under the UCCJEA includes proceedings for neglect, abuse, and termination of parental rights. Ark. Code Ann. § 9-19-102(4).

> An Arkansas court has jurisdiction to make an initial child-custody determination if this state is the home state of the child on the date of the commencement of the proceedings. Ark. Code Ann. § 9-19-201(a)(1). By definition of law, a "home state" is "the state in which the child lived with a parent or a person acting as a parent for at least six (6) consecutive months immediately before the commencement of a child-custody proceeding." Ark. Code Ann. § 9-19-102(7). An Arkansas court may also exercise temporary emergency jurisdiction as described by § 9-19-204:

> (a) A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

> (b) If there is no previous child-custody determination that is entitled to be enforced under this chapter, and a child-custody proceeding has not been commenced in a court of a state having jurisdiction under §§ 9-19-201–[203], a child-custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under §§ 9-19-201–[203]. If a

---

[6]The TPR order lists three statutory grounds: (1) failure to remedy, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(*a*); (2) subsequent factors, section 9-27-341(b)(3)(B)(vii)(*a*); and (3) aggravated circumstances, section 9-27-341(b)(3)(B)(ix)(*a*)(1)–(5).

13

child-custody proceeding has not been or is not commenced in a court of a state having jurisdiction under **§§ 9-19-201–[203]**, a child-custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child.

(c) If there is a previous child-custody determination that is entitled to be enforced under this chapter, or a child-custody proceeding has been commenced in a court of a state having jurisdiction under **§§ 9-19-201–[203]**, any order issued by a court of this state under this section must specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under **§§ 9-19-201–[203]**. The order issued in this state remains in effect until an order is obtained from the other state within the period specified or the period expires.

(d) A court of this state which has been asked to make a child-custody determination under this section, upon being informed that a child-custody proceeding has been commenced in, or a child-custody determination has been made by, a court of a state having jurisdiction under **§§ 9-19-201–[203]**, shall immediately communicate with the other court. A court of this state which is exercising jurisdiction pursuant to **§§ 9-19-201–[203]**, upon being informed that a child-custody proceeding has been commenced in, or a child-custody determination has been made by, a court of another state under a statute similar to this section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order.

*Trevino v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 182, at 3–5, 645 S.W.3d 19, 21–22.

In *Terrell v. Arkansas Department of Human Services*, 2015 Ark. App. 582, at 4–5, 474 S.W.3d 90, 92, we held that the trial court had jurisdiction under UCCJEA to terminate parental rights, reasoning in part as follows:

In *Davis* [*v. Arkansas Department of Health & Human Services*, 98 Ark. App. 275, 254 S.W.3d 762 (2007)], the appellant argued that the trial court erred in exercising jurisdiction beyond the initial emergency proceeding because the children had moved to Arkansas from Louisiana only four months before they were taken into custody. This court held that the UCCJEA did not require a trial court that had assumed temporary jurisdiction to return custody to a parent where there was no competing custody order. Because there was no credible evidence of a custody order or a current

14

custody proceeding in Louisiana, we held that the provisions of Arkansas Code Annotated section 9-19-204(b) applied, and Arkansas then became the home state of the children. We concluded that the trial court acted correctly when it continued to exercise subject-matter jurisdiction in the case and that such jurisdiction existed when the termination order was entered.

Our standard of review is de novo, although we will not reverse the trial court's findings of fact unless they are clearly erroneous. *Waugh, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Mills v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 197, at 5–6, 644 S.W.3d 256, 259. When a trial court has discretion to decide whether to decline to exercise jurisdiction under the UCCJEA, we will not reverse the decision absent an abuse of discretion. *Waugh, supra.*

III. *Jurisdiction*

Anita argues that Arkansas was not the child's home state when the matter commenced; she maintains that, therefore, the trial court did not have subject-matter jurisdiction. She does not cite Arkansas Code Annotated section 9-19-204 (Repl. 2020), the emergency-jurisdiction provision of the UCCJEA, but she does not dispute that Arkansas has the power to protect the child in an emergency. She maintains that "this case went well beyond the need to maintain [the child] in Arkansas in order to protect him."

Anita distinguishes her case from *Defell v. Arkansas Department of Human Services*, 2022 Ark. App. 27, wherein sufficient evidence supported Arkansas's continued jurisdiction. Significant connection with Arkansas was determined in *Defell* because the children and Defell had family in Arkansas, Defell provided DHS with Arkansas addresses, all the services

were provided to the family in Arkansas, and Defell traveled back and forth into Arkansas from Tennessee to transport drugs for her mother. *Defell*, 2022 Ark. App. 27, at 6. In contrast, Anita contends that she never accessed services in Arkansas "beyond visitation," that she had no family in Arkansas, and that she always maintained her residency in New Mexico.

Anita argues that Ms. Hutto's testimony demonstrated that due to the distance between Arkansas and New Mexico, she did not know if Anita could parent the minor child, whether Anita was drug-free, whether Anita had a safe home, or if Anita had sufficient income. Anita contends that if the State is going to keep a nonresident child that was only passing through in its foster-care system, it should be required to do more groundwork before deciding to terminate parental rights and sever the child from his connections to family in New Mexico. *Tuck v. Ark. Dep't of Hum. Servs.*, 103 Ark. App. 263, 268, 288 S.W.3d 665, 669 (2008) (duty of DHS to provide services is not triggered by parents' diligence or enthusiasm).

We hold that the trial court did not abuse its discretion in finding that it had subject-matter jurisdiction. The trial court exercised emergency jurisdiction under the UCCJEA. That emergency jurisdiction continued to the termination hearing because there was no evidence of any custody order from any other state demonstrating jurisdiction. Ark. Code Ann. § 9-19-204(a)–(b); *Trevino*, *supra*; *Terrell*, *supra*.

IV. *Due Process*

16

Anita argues that denying her any meaningful opportunity to defend TPR resulted in a violation of her due-process rights. She contends that under the Due Process Clause of the Fourteenth Amendment, she was guaranteed an opportunity to be heard during this entire proceeding and to defend the allegations against her in the termination petition. *See Kight v. Ark. Dep't of Hum. Servs.*, 94 Ark. App. 400, 231 S.W.3d 103 (2006) (affirming in face of due-process argument that appellant not given notice of standard of conduct required). Her counsel argued that she had a constitutional right to be present, that she was not afforded any means to participate, and that counsel could not effectively represent her without some means afforded to permit her to assist in her own defense. She insists that, regardless of the trial court's finding that she could not attend via videoconferencing "due to connectivity issues" and that DHS offered to pay for a plane ticket, she could not fly due to her medical conditions, and DHS did not offer her an alternative means, such as a bus ticket. She argues that her credibility has nothing to do with her right to due process.

Anita maintains that the error was not cured by her attorney's participation in the termination matter. *See Edwards v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 37, 480 S.W.3d 215 (due-process argument not preserved; *Wicks* exception inapplicable; appellant's absence did not equate to attorney's inability to safeguard due-process rights). Anita argues that her attorney was very clear that she was unable to effectively safeguard Anita's rights without her appearance either in person or via video. She contends that her counsel was unable to present a defense, did not call witnesses, and could not dispute DHS's version of events.

We agree with DHS's contention that Anita's argument should be rejected because the trial court never denied her the opportunity to be present for the termination hearing—it only denied her the ability to appear via Zoom because of her repeated inability to follow the court's instructions while using the platform. Further, even after she had objected to the lack of Anita's appearance, her attorney clearly stated that she was prepared, stating, "[P]repared as I can be without a client." DHS had offered to pay for a plane ticket and hotel room so that Anita could appear, but Anita insists this offer was insufficient because of her health issues. The trial court disagreed and found that Anita, who was not credible, did not provide proof of her newfound health issues. The court found that even if she were unable to fly, she had the financial means to come to Arkansas because she had traveled here previously and had money to put on Robert's book in jail. *Glover v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 278, 577 S.W.3d 13 (credibility determinations are left to the trial court, and appellate courts will not reweigh the evidence on appeal). At almost every hearing, the trial court found Anita not to be a credible witness, and she was caught in multiple lies throughout the case. Accordingly, her ability to appear and testify held little value with the trial court. *See Vogel v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 671, 476 S.W.3d 825 (attorney's alleged errors would not have affected termination outcome because facts overwhelmingly favored TPR).

## V. *Statutory Grounds*

A court may order termination of parental rights if it finds clear and convincing evidence to support one or more statutory grounds listed in the Juvenile Code, Arkansas

18

Code Annotated section 9-27-341(b)(3)(B) (Supp. 2021), and that termination is in the best interest of the child, taking into consideration the likelihood of adoption and the potential harm to the health and safety of the child that would be caused by returning him or her to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). This best-interest determination includes consideration of the evidence supporting the specific grounds for termination. *Camarillo-Cox v. Ark. Dep't of Hum. Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005).

Anita contends that the trial court erred in terminating her parental rights on the subsequent-factors ground. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*).[7] She argues that this ground requires that DHS offer appropriate family services to address the subsequent factors and that DHS offered her services for only a two-month period during the case. Anita asserts that Ms. Hutto blamed her for the lack of services, testifying that New Mexico could not contact Anita to start services. However, Anita counters that Ms. Hutto also testified that Anita regularly communicated with her and that Ms. Hutto did nothing to try and facilitate communication between Anita and New Mexico.

We hold that the trial court did not clearly err in terminating Anita's parental rights on the subsequent-factors ground. After the petition had been filed, Anita was ordered to

_____

[7]Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(*a*) provides:

That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

cooperate with DHS, submit to drug screens, maintain stabling housing and employment, visit the minor child, and submit to maternity testing. On November 3, 2020, DHS was ordered to provide maternity testing, and Anita was ordered to comply. On November 30, 2020, Anita was found to have not submitted to the test. The trial court ordered testing to determine whether Anita was the child's mother on at least four occasions. A parent's failure to comply with the case plan and court orders may be considered a subsequent factor. *E.g.*, *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, 555 S.W.3d 915. Proof of only one statutory ground is sufficient to terminate parental rights. *Alexander v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 345, 634 S.W.3d 807. Because only one statutory ground must be proved to support termination of parental rights, we do not address the other statutory grounds found by the trial court. *Easter v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 441, 587 S.W.3d 604.

## VI. *Best Interest*

Anita contends that the evidence was insufficient to demonstrate that termination was in the minor child's best interest.

> The best-interest analysis includes consideration of the likelihood that the children will be adopted and of the potential harm caused by returning custody of the children to the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). However, adoptability and potential harm are merely factors to be considered—they are not elements of the cause of action and need not be established by clear and convincing evidence. *See Chaffin [v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 522, 471 S.W.3d 251]. Rather, after considering all of the factors, the trial court must find by clear and convincing evidence that termination of parental rights is in the best interest of the children. *Id.*

*Wafford v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 299, at 7, 495 S.W.3d 96, 101.

20

Considerations in making a best-interest finding may include: the preservation of the children's relationship with a grandparent; the severance of child support from a parent; whether a less drastic measure could be employed such as a no-contact order or supervised visitation; whether continued contact with the parent would be beneficial to the children if or when the children are living with a relative and not in an indeterminate state that is working against them; and whether the children are living in continued uncertainty.

*Phillips v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 383, at 11–12, 585 S.W.3d 703, 709–10.

Anita argues that the Arkansas legislature has codified the promotion of the well-being of children and declared that placement with relatives is the preferred goal when accomplishing permanency for them. *See* Ark. Code Ann. § 9-28-1003 (Repl. 2020) (safeguards for children in foster care); Ark. Code Ann. §§ 9-28-105 (preference to relative caregivers in foster care placement); -106 (religious preference considered in custodial placements); -107 (notice to grandparents); -108 (relatives given preferential consideration in custodial placement). She argues that the statutory preference that a juvenile be placed with a relative applies at all stages of a dependency-neglect case. *Ellis v. Ark. Dep't of Hum. Servs.*, 2016 Ark. 441, 505 S.W.3d 678 (clarifying that Ark. Code Ann. § 9-27-355(b)'s statutory preference for relative placement is not limited to initial placement). Anita contends that, despite her sister's requests for placement and the concurrent goals of relative placement and adoption, the trial court terminated parental rights, thereby terminating any relative's rights.

She asserts that the law requires that the trial court give preference to the least restrictive disposition when considering dispositional alternatives. Ark. Code Ann. § 9-27-329(d) *see Lively v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 131, 456 S.W.3d 383; *Ivers v.*

21

*Ark. Dep't of Hum. Servs.*, 98 Ark. App. 57, 250 S.W.3d 279. The least restrictive option is a relevant consideration for the best-interest determination. *Phillips*, *supra*. Anita argues that in *Clark v. Arkansas Department of Human Services*, 2016 Ark. App. 286, 493 S.W.3d 782, relative consideration was extended to grandparents, and the court noted that it is unlikely a grandparent would be allowed to adopt the child after termination if the child is not placed with the grandparent beforehand. She further asserts that the rights of a relative are derivative of the rights of the parent. *Burt v. Ark. Dep't of Hum. Servs.*, 99 Ark. App. 402, 261 S.W.3d 468 (2007). Anita argues that termination was unnecessary when placement with the maternal aunt was still an option. She contends that multiple factors weighed in favor of family preservation, which included maintaining the relationship between the minor child and his aunt. She argues that DHS disregarded the state's public policy to strengthen family ties. *See* Ark. Code Ann. § 9-27-302.

We hold that sufficient evidence supports the trial court's best-interest finding. Anita does not challenge the court's adoptability and potential-harm finding; therefore, she waives any argument related to these factors. *See, e.g.*, *Easter*, *supra*. Instead, she argues that her sister was available for placement and had an approved ICPC home study. However, the trial court specifically found Anita's sister inappropriate for placement as a result of her statements at the permanency-planning hearing about her coparenting with Anita, the facts surrounding her home's financing and ownership, and her family's potential move. Accordingly, we affirm.

Affirmed.

KLAPPENBACH and HIXSON, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Casey D. Copeland*, attorney ad litem for minor child.